**HIGH LIFE SALES COMPANY,**
**Plaintiff–Respondent,**

v.

**BROWN–FORMAN CORPORATION,**
**Defendant–Appellant.**

No. 73494.

Supreme Court of Missouri,
En Banc.

Jan. 28, 1992.

Thomas E. Wack, Thomas Walsh, Mark Leadlove, St. Louis, for defendant-appellant.

Paul V. Herbers, Barbara B. Davydov, Kansas City, for plaintiff-respondent.

THOMAS, Judge.

In this case we face the issue of whether the Missouri courts should continue to refuse to enforce forum selection clauses that provide that any action brought on the contract shall be brought outside Missouri on the grounds that such a clause is against public policy and void, per se. We adopt, in place of the old rule, the proposition that such a clause should be enforced unless it is unfair or unreasonable to do so. We affirm the trial court's decision not to enforce the forum selection clause in the present case because we believe it would be unreasonable to require this particular case to be brought in Kentucky pursuant to the forum selection clause, and we affirm the substantive decision of the trial court that § 407.413, RSMo 1986, is applicable and prohibits termination of the Distributorship Agreement involved herein.

High Life Sales Company (High Life), the plaintiff below, has been engaged in the distribution of alcoholic beverages, principally beer, for many years. It is the exclusive distributor in the Jackson County, Missouri, area for all products of Miller Brewing Company, which constitute the vast majority of its sales (approximately 98%). In 1983, High Life began distributing a low alcohol wine cooler product known as "California Cooler" under an oral agreement with California Cooler, Inc. ("CCI"), whose principal place of business is in California. Subsequently, High Life and CCI negotiated through their respective counsel and, on July 15, 1985, entered into a written Distributorship Agreement.

The Distributorship Agreement provided that any termination must be in accordance with §§ 407.405 and 407.413. Section 407.-413.2 provides that "[n]otwithstanding the terms, provisions and conditions of any franchise, no supplier shall unilaterally terminate" any franchise with the wholesaler except for good cause as defined in section § 407.413.5. Despite this provision, the agreement purported to modify the meaning of "good cause." The agreement also contained a forum selection clause providing that any action for payment for goods sold and delivered may be brought where title to the goods passed to the buyer and that any other action on or related to the agreement shall be brought only in the judicial district containing the defendant's principal place of business.

Later in 1985, Defendant Brown–Forman, whose principal place of business is in Louisville, Kentucky, acquired the assets of CCI, including the assignment of the Distributorship Agreement from CCI to Brown–Forman. High Life consented to this sale and assignment.

During 1987, Brown–Forman decided to consolidate all of its Missouri distribution for all of its products in a single distributor, Paramount Liquor Company ("Paramount"), a Missouri corporation not subject to suit in Kentucky. In September 1987, Brown–Forman gave ninety days written notice of termination to all thirty-one of its Missouri distributors, including High Life. The termination was effective December 31, 1987. On November 3, 1987, High Life sued Brown–Forman and Paramount in the Circuit Court of Jackson County, Missouri, claiming the termination violated § 407.-413. High Life sought injunctive relief, which was denied, and damages.

Brown–Forman filed a motion to dismiss claiming that (1) § 407.413 is inapplicable and (2) the forum selection clause requires

that the action be brought in Kentucky. The trial court overruled Brown–Forman's motion to dismiss. Thereafter, Paramount filed a motion to dismiss, and High Life filed a motion for summary judgment claiming that § 407.413 is applicable, that its requirements of good cause for termination were not met and that the termination was unlawful. Brown–Forman also filed a motion for summary judgment on the ground that § 407.413 has no application. After briefing and oral arguments, the trial court granted High Life's motion for summary judgment on the issue of liability and overruled Brown–Forman's motion for summary judgment. The court also granted Paramount's Motion to Dismiss. The issue of damages was tried to a jury in February of 1990; the jury returned a verdict in High Life's favor for $91,000. Brown–Forman appeals primarily on the issues of the enforceability of the forum selection clause and the applicability of §§ 407.400 to 407.420.

We must first decide whether this case can properly be decided by the Missouri courts in view of the parties' agreement that it would be brought in Kentucky, the principal place of business of the defendant, Brown–Forman. Two cases represent the primary authority in Missouri on this issue; they are *Reichard v. Manhattan Life Ins. Co.*, 31 Mo. 518 (1862), and *State ex rel. Gooseneck Trailer Mfg. Co., v. Barker*, 619 S.W.2d 928 (Mo.App.1981). *Reichard* was a suit on a life insurance policy claiming misrepresentations as to alcohol use and present state of health in the application for life insurance by the insured. The insurance contract contained a provision that the insured waived all right to bring any action on the policy except in the courts of New York. Missouri had a statute, enacted in 1855, that required any life insurance company doing business in Missouri to authorize any person having a claim against the company growing out of the contract of insurance to sue the insurance company in any court in Missouri. The *Reichard* court held that this waiver

clause (a form of forum selection clause) would not be enforced both because it violates public policy and because of the statute.

*Gooseneck* cites *Reichard* and states that the state courts are not obligated to follow precedent[1] of the federal courts, which have questioned the validity of *Reichard; Gooseneck* held that the forum selection clause was not a sufficient basis for granting plaintiff's motion to dismiss in the Missouri court.

There is virtually no case authority in Missouri during the 119 years between *Reichard,* which defendant Brown–Forman argues is not applicable, and the *Gooseneck* decision by the Court of Appeals, Southern District. In *State ex rel. Marlo v. Hess,* 669 S.W.2d 291 (Mo.App.1984), the Eastern District distinguished the *Gooseneck* situation, which involves an outbound forum selection clause (one providing for trial outside of Missouri) from the inbound clause (one providing for trial in Missouri) at issue in *Marlo;* the *Marlo* court held that an inbound clause should be enforced so long as doing so is neither unfair nor unreasonable. *See also Chase Third Century Leasing Co., Inc. v. Williams,* 782 S.W.2d 408 (Mo.App.1989), where the court again enforced an inbound clause. In *Medicine Shoppe Int'l, Inc. v. Browne,* 683 F.Supp. 731 (E.D.Mo.1988), the federal court, applying Missouri substantive law, summarized the distinction between Missouri's treatment of outbound and inbound clauses as follows:

Missouri law on the enforceability of forum selection clauses is clear: forum selection clauses which purport to prevent courts within the State of Missouri from exercising their jurisdiction to hear actions brought by Missouri citizens are void as against the Missouri public policy of providing Missouri citizens with access to courts within the State of Missouri. In contrast, forum selection clauses which designate the State of Missouri or a particular court within the State of Missouri as the exclusive forum in which

---

1. *Public Water Supply District, v. American Ins. Co.,* 471 F.Supp. 1071 (W.D.Mo.1979), and *Dick* *Proctor Imports, Inc. v. Sumitomo Corp.,* 486 F.Supp. 815 (E.D.Mo.1980).

to bring actions are enforceable so long as the clauses are not unfair and are not unreasonable.

*Id.* at 732 (citations omitted). In *Medicine Shoppe,* the federal court held that the forum selection clause that required any action arising from the franchise agreement be brought in Federal District Court for the Eastern District of Missouri was fair, reasonable and, therefore, enforceable under Missouri law.

We conclude that Missouri should no longer treat outbound forum selection clauses as per se violations of public policy. Our reasons include: first, there is considerable doubt whether *Reichard* was based solely upon the public policy aspects of enforcing a forum selection clause since it was based in part upon the 1855 Missouri statute specifically authorizing foreign insurance companies to be sued in Missouri. The refusal in that case to enforce the clause that required all litigation on the policy to be brought in New York is a far cry from the issue of whether this Court should generally enforce the type of forum selection clause involved in the present case. Second, the public policy of allowing and encouraging freedom of contract and enforcing the parties' agreement whether they be citizens of Missouri or elsewhere, so long as doing so is neither unfair nor unreasonable, outweighs any public policy involved in guaranteeing Missouri citizens a right to the Missouri courts when they have entered into an arm's length agreement that provides otherwise. Third, the one-way nature of Missouri's decisions in refusing to enforce outbound agreements while enforcing inbound agreements must be premised on the assumption that the Missouri courts have a corner on fair and just trials. We are proud of the Missouri courts but not so much as to override a valid agreement entered into by our citizens to litigate elsewhere. Finally, the one-way enforcement of the Missouri rule, because of its uneven impact, may well add to any overcrowding condition in the Missouri courts in circumstances where the parties, by their agreement, have indicated a willingness to litigate elsewhere.

The early cases in many jurisdictions that refused to enforce outbound forum selection clauses often relied upon an "ouster of jurisdiction" theory as the specific public policy argument supporting per se invalidity; it was said that the agreement of the parties should not operate to deprive a court of jurisdiction over parties and issues otherwise properly before that court. This argument was justified by *M/S Bremen, GMBH v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), which made the point that the majority rule that enforces such clauses, so long as doing so is neither unfair nor unreasonable, does not deprive the non-designated state of jurisdiction except to the extent that in its discretion it determines that the enforcement of the clause is neither unfair nor unreasonable. The validity of this observation is best evidenced by the ultimate decision we make in this case to refuse to enforce the forum selection clause because of the importance to Missouri of determining the application of a previously uninterpreted statute in an area of important public policy (liquor control). The rule we adopt today combines the best of both worlds in that it retains jurisdiction when the Missouri courts determine that to be necessary or desirable and not unfair while enforcing the valid agreement of the parties on other occasions.

Following the important Supreme Court decision in *M/S Bremen,* many jurisdictions adopted the rule upholding the parties' free contractual choice, at least where the agreement was not unreasonable.[2]

---

**2.** *Volkswagenwerk, A.G. v. Klippan, GmbH,* 611 P.2d 498 (Alaska 1980), *cert. denied,* 449 U.S. 974, 101 S.Ct. 385, 66 L.Ed.2d 236 (1980); *Societe Jean Nicolas et Fils, J.B. v. Mousseux,* 123 Ariz. 59, 597 P.2d 541 (1979); *SD Leasing, Inc. v. Al Spain and Assocs., Inc.,* 277 Ark. 178, 640 S.W.2d 451 (1982); *Smith, Valentino & Smith, Inc. v. Super.Ct. of Los Angeles County,* 17 Cal.3d 491, 131 Cal.Rptr. 374, 551 P.2d 1206 (1976); *ABC Mobile Sys., Inc. v. Harvey,* 701 P.2d 137 (Colo.App.1985); *Funding Sys. Leasing Corp. v. Diaz,* 34 Conn.Supp. 99, 378 A.2d 108 (1977); *Elia Corp. v. Paul N. Howard Co.,* 391 A.2d 214 (Del.Super.1978); *Manrique v. Fabbri,* 493 So.2d 437 (Fla.1986); *Calanca v. D & S Mfg. Co.,* 157 Ill.App.3d 85, 109 Ill.Dec. 400, 510 N.E.2d 21

Only five states in addition to Missouri presently follow a rule that treats forum selection clauses as unenforceable, per se.[3] It has been suggested Missouri should definitely join the majority of jurisdictions that recognize the validity of freely negotiated forum selection agreements. *See* Piraino, *Forum Selection Clauses in Missouri Courts*, 42 Mo.B.J. 130, 133–34 (1991). By this opinion, we join the better-reasoned majority rule and will enforce such clauses, so long as doing so is neither unfair nor unreasonable.

We must next consider whether enforcing the forum selection clause in the present situation would be either unfair or unreasonable. Many courts have refused to enforce a forum selection clause on the grounds of unfairness if the contract was entered into under circumstances that caused it to be adhesive. *Colonial Leasing Co. of New England, Inc. v. Best*, 552 F.Supp. 605 (D.Or.1982). An adhesive contract is one in which the parties have unequal standing in terms of bargaining power (usually a large corporation versus an individual) and often involve take-it-or-leave-it provisions in printed form contracts. The agreement in this case was not unfair in this respect; it was between two substantial and successful companies, drafted and agreed upon by their respective counsel following give-and-take negotiations on various provisions. It is not clear whether there was specific negotiation on the forum selection clause, but this is not critical; the important factor is that the contract terms were generally arrived at

under circumstances that cannot be described as "adhesive."

Another factor that mitigates in favor of the fairness of enforcing this forum selection clause is the neutral and reciprocal nature of this particular clause. Rather than providing one particular venue where all litigation shall be brought, this clause provides that the litigation shall be brought at the principal place of business of the defendant. Thus, under this clause if Brown–Forman files the lawsuit, the venue would be in Missouri, but if High Life files a lawsuit, the clause calls for it to be filed in Kentucky. Not only does the reciprocal nature of this clause favor its enforcement, but public policy also should favor such a clause because it discourages hasty litigation. A race to the courthouse by either party puts the lawsuit in the opponent's backyard; as a general proposition, this type of provision should be favored. We do not find circumstances present that would cause the enforcement of this forum selection clause to be unfair.

We must also consider whether enforcement of the forum selection clause in this particular case would be unreasonable. The controlling substantive issue in this litigation, the application of § 407.413 to the liquor distribution franchise agreement between Brown–Forman, as the supplier, and High Life, as the licensed distributor, involves a matter of important public policy to the state of Missouri. In general, the control of liquor distribution is an important state interest in Missouri. *See Vaughan v. EMS*, 744 S.W.2d 542, 547

---

(1987); *Prudential Resources Corp. v. Plunkett*, 583 S.W.2d 97 (Ky.App.1979); *Hauenstein & Bermeister, Inc. v. Met–Fab Indus., Inc.*, 320 N.W.2d 886 (Minn.1982); *Air Economy Corp. v. Aero–Flow Dynamics, Inc.*, 122 N.J.Super. 456, 300 A.2d 856 (1973); *Credit Francais Int'l, S.A. v. Sociedad Financiera de Comercio, C.A.*, 128 Misc.2d 564, 490 N.Y.S.2d 670 (1985); *United Standard Management Corp. v. Mahoning Valley Solar Resources, Inc.*, 16 Ohio App.3d 476, 476 N.E.2d 724 (1984); *Reeves v. Chem Indus. Co.*, 262 Or. 95, 495 P.2d 729 (1972); *St. John's Episcopal Mission Ctr. v. South Carolina Dept. of Social Services*, 276 S.C. 507, 280 S.E.2d 207 (1981); *Green v. Clinic Masters, Inc.*, 272 N.W.2d 813 (S.D.1978); *International Collection Serv., Inc. v. Gibbs*, 147 Vt. 105, 510 A.2d 1325 (1986).

3. *Keelean v. Central Bank of the South*, 544 So.2d 153 (Ala.1989); *Cartridge Rental Network v. Video Entertainment, Inc.*, 132 Ga.App. 748, 209 S.E.2d 132 (1974); Alabama and Georgia appear to follow the common law rule of per se invalidity. *Cerami–Kote, Inc. v. Energywave Corp.*, 116 Idaho 56, 773 P.2d 1143 (1989); *Polaris Indus., Inc. v. District Court*, 215 Mont. 110, 695 P.2d 471 (1985); *Fidelity Union Life Ins. Co. v. Evans*, 477 S.W.2d 535 (Tex.1972); the latter three states still follow the common law rule of per se invalidity, but their decisions appear to be based on special venue statutes.

(Mo.App.1988), and *May Department Stores v. Supervisor of Liquor Control,* 530 S.W.2d 460, 468 (Mo.App.1975). Liquor distribution is an area that has always been heavily regulated by state government; moreover, the methods of distribution and extent of regulation vary enormously from state to state. It is evident that in this area what one state may approve and even encourage, another state may prohibit and declare illegal. This principle even has constitutional endorsement by reason of the Twenty–First Amendment to the United States Constitution repealing Prohibition. Thus, the interest that a particular state has in construing and applying liquor control legislation in its own state is apparent.

■ It is very much within the interest of the state of Missouri to protect its licensed liquor distributors from unwarranted or unjustified termination of their franchise. Section 407.413 does just this by providing that no such franchise shall be terminated except for good cause. Both the general subject of liquor control and the specific statutory protection of a holder of a liquor distribution franchise carry heightened public policy considerations that outweigh any public policy considerations involved in the enforcement of a forum selection clause.

Moreover, the Eighth Circuit Court of Appeals recently recognized the strong public policy reflected in Chapter 407 generally and particularly with respect to § 407.405, which requires a ninety day notice for the termination of a franchise. Section 407.405 is a companion section to § 407.413, and both involve the same issue as to applicability as spelled out in § 407.400(1). In *Electrical and Magneto Service Co., Inc. v. AMBAC International Corp.,* 941 F.2d 660 (8th Cir.1991), the court refused to apply a South Carolina choice of law provision because this would constitute a waiver of the benefits of Chapter 407; "to do so would violate a fundamental policy of Missouri." In holding that the public policy involved in Chapter 407 is so strong that parties will not be allowed to waive its benefits, the court stated:

In short, Chapter 407 is designed to regulate the marketplace to the advantage of those traditionally thought to have unequal bargaining power as well as those who may fall victim to unfair business practices. Having enacted paternalistic legislation designed to protect those that could not otherwise protect themselves, the Missouri legislature would not want the protections of Chapter 407 to be waived by those deemed in need of protection. Furthermore, the very fact that this legislation is paternalistic in nature indicates that it is fundamental policy: "a fundamental policy may be embodied in a statute which ... is designed to protect a person against the oppressive use of superior bargaining power." Restatement (Second) of Conflicts § 187 comment g.

\* \* \* \* \* \*

The Missouri statutes in question, relating to merchandising and trade practices, are obviously a declaration of state policy and are matters of Missouri's substantive law. To allow these laws to be ignored by waiver or by contract, adhesive or otherwise, renders the statutes useless and meaningless.

*Electrical and Magneto Service Co.,* 941 F.2d at 663, 664.

Several other factors are present that dictate that it would be unreasonable for Missouri to send this case to Kentucky. Because § 407.413 has never been interpreted by the Missouri courts, there are no guidelines for an out-of-state court with respect to whether the statute should be applied in this situation. Moreover, Kentucky does not have a statute even remotely similar to § 407.400. One could conclude that the absence of such a statute in Kentucky suggests that their public policy is contrary to that of Missouri, which obviously seeks to protect its citizens from an unjustified termination of a liquor franchise agreement.

Cases in other jurisdictions that enforce forum selection clauses in circumstances that are reasonable have refused to enforce such clauses in circumstances similar to the present case. In *Lulling v. Barnaby's*

*Family Inns, Inc.,* 482 F.Supp. 318 (E.D.Wis.1980), an equipment lease had a forum selection clause that called for suit in Illinois, but Wisconsin law was to be applied, and particularly the Wisconsin Franchise Investment Statute, which regulated the offer and sale of the franchise related to the equipment lease in issue. The court held that it would be unreasonable to require Wisconsin citizens to litigate their claims based on a Wisconsin law in the Illinois courts.

In *Cutter v. Scott & Fetzer Co.,* 510 F.Supp. 905 (E.D.Wis.1981), defendant sought to terminate plaintiff's franchise agreement. The franchise agreement had a forum selection clause calling for venue in Ohio, but plaintiff contended that the termination violated the Wisconsin Fair Dealership Law, a statute that is very much like §§ 407.400–420, in that it is intended "to promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis." *Cutter,* 510 F.Supp. at 908, *quoting* Wis. Stat. § 135.025(2)(a)(1975). One of the issues in the case was whether the termination of plaintiff's dealership was without "good cause." *Id.* Just as the Eighth Circuit ruled in *Electrical and Magneto Service, Inc.,* 941 F.2d 660, with regard to § 407.405, the Wisconsin court pointed out that the Fair Dealership Law "may not be varied by contract or agreement." The court said that the Fair Dealership Law is intricate and complex and that the Wisconsin courts are better prepared to consider a case under this statute than courts in Ohio because the experience of a Wisconsin judge with this statute is probably greater than that of any judge in Ohio. In holding that it would be unreasonable to enforce the forum selection clause, the Wisconsin court stated:

> In summary, I am persuaded that it would be unjust to require the plaintiff to pursue this action in Ohio. I make this determination fully aware of the nature of the forum-selection clause when considered in conjunction with the nature of the plaintiff's claims. I do not presume to hold that a clause of this type

will never be upheld when contained in a contract of this nature, nor do I hold that a claim based on the Fair Dealership Law can only be litigated in a Wisconsin court. However, when the circumstances of this case are considered in totality, I find that the better course is to refuse to apply the forum-selection clause contained in the contract between the parties.

*Cutter,* 510 F.Supp. at 909.

In *Hall v. Super. Ct. in & For County of Orange,* 150 Cal.App.3d 411, 197 Cal. Rptr. 757 (4 Dist.1983), the enforceability of the forum selection clause contained in two California gas and oil limited partnerships was considered. The partnerships were apparently negotiated in California, but the parties flew to Nevada to execute the agreement. The agreement designated California for the choice of laws but contained a Nevada forum selection clause. The California Corporate Securities Law of 1968 controlled, and it, in turn, contained a clause that provided that any attempt to waive compliance with the California statute was void. The court held that enforcing the Nevada forum selection clause under these circumstances would violate the public policy of California and, therefore, denied enforcement of the forum selection clause as unreasonable. The court stated:

> California's policy to protect securities investors, without more, would probably justify denial of enforcement of the choice of forum provision, although a failure to do so might not constitute an abuse of discretion; but [the statutory provision], which renders void any provision purporting to waive or evade the Corporate Securities Law, removes that discretion and compels denial of enforcement.

*Hall,* 197 Cal.Rptr. at 762.

So it is with Missouri's statute concerning termination of liquor franchises; its importance to the public policy of the state, evidenced in part by the fact that any effort to waive or modify its provisions is unenforceable, dictates that this Court should not abrogate the responsibility of interpreting this important statute to the

Kentucky courts. We hold that enforcement of the forum selection clause under these circumstances would be unreasonable and, therefore, even under the rule we adopt today, the issues in this case should be decided by the courts in Missouri.

■ Having decided it was proper to bring this action in Missouri, we then turn to the trial court's determination of the substantive issues and, particularly, whether the termination of the franchise was valid under the terms of the Distributorship Agreement and the applicable Missouri statutes. Paragraph 9 of the agreement provides that "any termination must be in accordance with Missouri § 407.405 and § 407.413."

Paragraph 9 also purported to modify the meaning of "good cause" in § 407.413 by providing: "The parties agree that 'good cause' for the purpose of § 407.413 means facts, which under the circumstances would permit a reasonable and prudent person to believe that the action is based upon acceptable and reasonable trade practices...."

High Life's claim that the termination was improper is based on § 407.413.2, which provides:

> *Notwithstanding the terms, provisions and conditions of any franchise,* no supplier shall unilaterally terminate or refuse to continue or change substantially the condition of any franchise with the wholesaler unless the supplier has first established good cause for such termination, noncontinuance, or change.

(Emphasis added.) If the Distributorship Agreement between Brown–Forman and High Life is covered by this provision, it will impact in two very important ways. First, it will nullify the attempt by the agreement to modify the meaning of "good cause." Second, it specifies that "good cause," as defined in § 407.413.5 is required for termination. Section 407.413.5 provides:

> As used in this section, "good faith" is the duty of each party to any franchise and all officers, employees or agents thereof to act in a fair and equitable

manner towards each other, and "good cause" means either of the following:

> (1) Failure by the wholesaler to comply substantially with the provisions of an agreement or understanding with the supplier, which provisions are both essential and reasonable; or

> (2) Use of bad faith or failure to observe reasonable commercial standards of fair dealing in the trade.

Brown–Forman concedes that it did not have good cause as defined by the statute, whereas High Life concedes that Brown–Forman had good cause under the attempted modification of the meaning of good cause. Thus, the sole controlling issue on liability turns on the issue of whether this Distributorship Agreement is controlled by §§ 407.400–420. Because of the respective concessions by the parties, this issue was decided by the trial court and must be decided by this Court as a matter of law upon the parties' respective motions for summary judgment.

Section 407.413, relied upon by High Life, covers any "franchise" as defined in § 407.400(1). This definitional section is particularly complex because it contains both an original, general definition of "franchise," applying to all types of businesses and not limited to liquor franchises, as well as a specific definition added by the legislature in 1984 to specifically include liquor franchises. Moreover, the relevant portion of the statute is one long, rambling sentence containing various phrases specifying different aspects of the definition. It is helpful in analyzing the meaning of the statute to divide and label the relevant portions, to delete (indicated by ellipses) unnecessary language and to label by descriptive terms the various parts of the definition.

It is also helpful in analyzing the statute to identify in advance the format of the definition so that the reader knows what to look for and where to "pigeonhole" the various phrases and terms encountered in reading and analyzing the lengthy and rambling sentence. The statute first contains a general definition of "franchise" applicable generally to all types of businesses; it

then contains a specific definition of liquor distribution agreements that are included. The latter definition is in terms of the parties that the agreement must be between (a "wholesaler" and a "supplier") and the type of products that must be distributed under such a liquor distribution agreement. The statute, with the respective phrases separated and labeled in the left-hand margin and with language unnecessary to the present inquiry deleted, reads as follows:

407.400.  Definitions
As used in sections 407.400 to 407.420:

I.  Term defined

(1) "Franchise" means

A.  General definition (not limited to a liquor franchise)

a written or oral arrangement . . . in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise,

II.  Liquor franchise defined

including but not limited to

A.  Parties

a commercial relationship . . . between:

1.  Wholesaler

a "wholesaler,"

—Defined

such wholesaler being a person as defined in this section, licensed . . . to sell at wholesale, spirituous liquor and wine <u>containing alcohol in excess of five percent by weight</u> to retailers, duly licensed in this state, and (emphasis added)

2.  Supplier

a "supplier,"

—Defined

being a person engaged in the business as a manufacturer, distiller, rectifier or out-of-state solicitor whose brands of spirituous liquor and wine are distributed through duly licensed wholesalers in this state, and

B.  Granting the right to sell

wherein a wholesaler is granted the right to offer, sell, and distribute within this state or any designated area thereof

1.  Product sold

such of the supplier's brands of spirituous liquors and wines, or all of them, as may be specified;

III.  Exception not applicable

except that, . . . [The remainder of the statute excepts certain sales, none of which are claimed to be applicable to the issues in this case.]

---

[Separation paragraphing and outline headings in the left-hand margin are ours.] High Life claims it fits under the special liquor distribution definition. (See II above.)

High Life meets the definition of a wholesaler because it is licensed under Chapter 311, RSMo, to sell at wholesale spirituous liquor and wine containing alcohol in excess of five percent by weight. (See II,A,1.) In fact, it is licensed pursuant to § 311.180.1(8) to sell at wholesale intoxicating liquor containing not in excess of twenty-two percent of alcohol by weight. Although there is a different license for the sale of malt liquor containing not in excess of five percent of alcohol by weight under § 311.180.1(7), the type of license is cumulative so that the holder of a twenty-two percent license can also sell either malt liquor or spirituous liquor and wine containing less than five percent of alcohol by weight.

Continuing with the definition, Brown–Forman is a "supplier" because it is en-

gaged in the business as a "manufacturer, distiller, rectifier or out-of-state solicitor whose brands of spirituous liquor and wine are distributed through duly licensed wholesalers in this state."

We then reach the controlling issue: whether the product distributed under the agreement in question must be "spirituous liquor and wine containing alcohol in excess of five percent by weight" (the type of license required by the wholesaler) or whether the product distributed is simply required to be spirituous liquors or wines without regard to whether its percentage of alcohol is greater or less than five percent. The portion of the statute that describes the product required to be distributed (II,B,1.) says simply "spirituous liquors and wines." Brown–Forman argues that the language specifying the type of license required of a covered wholesaler (see II,A,1), namely a license to sell "spirituous liquor and wine containing alcohol in excess of five percent by weight," is constructively carried over and inserted in the phrase "spirituous liquor and wine," referred to in the remaining sections of the statute and, particularly, in paragraph II,B,1, which specifies that the product be "spirituous liquors and wines." High Life argues that there is no reason to carry over the alcoholic content requirement because the two paragraphs refer to entirely different matters; paragraph II,A,1 refers to the type of license required, and paragraph II,B,1 refers to the type of product distributed. More specifically, Brown–Forman argues that to support High Life's interpretation of paragraph II,B,1 you would have to read the specification of the type of product to state by implication, "spirituous liquors and wines, *even if containing less than five percent alcohol by weight.*" We disagree. The most direct, unambiguous, unequivocal method of stating that the percentage of alcohol is not to be a factor in paragraph II,B,2, specifying the type of product, is to make no reference to the percentage of alcohol. "Spirituous liquors and wines" without reference to any requirement as to the percentage of alcohol must certainly mean spirituous liquors and wines without regard to the percentage of alcohol. This conclusion is so obvious that it is redundant to state it; it says what it says. This is not a matter of construing an otherwise ambiguous provision. Rather, Brown–Forman's argument construes and interprets an otherwise unambiguous provision to create the ambiguity and thus justify its version of the interpretation that would constructively carry the alcohol content language from paragraph II,A,1 to paragraph II,B,1.

High Life is a "wholesaler" as defined in II,A,1 above. Brown–Forman is a supplier as defined in II,A,2. California Cooler is a type of "spirituous liquor and wine" required by II,B,1 to be distributed under a franchise defined in § 407.400. We hold that the distribution agreement between Brown–Forman and High Life covering California Cooler is covered by §§ 407.400–420, and that the good cause requirement of § 407.413 is applicable. Because Brown–Forman did not have good cause as required by § 407.413.2 for the termination, the trial court was correct in granting High Life's motion for summary judgment.

■ After the trial court ruled on liability in favor of High Life, the issue of High Life's damages was tried to a jury. Brown–Forman complains that the trial court erred in overruling Brown–Forman's motion in limine to exclude the testimony of Paul Pohle, plaintiff's expert damage witness, and in refusing to strike that testimony. Mr. Pohle explained that in his opinion California Cooler was an "add-on" product because it constituted only two percent of the gross sales of High Life; its volume was so small that most of the company's operating expenses were not increased when California Cooler was added as a product nor were they reduced when it was removed. For example, Pohle testified that the addition of California Cooler at the peak of its distribution averaged no more than fifteen cases per truck. California Cooler was delivered to the same customers to whom beer was delivered, and there was room on those trucks for the requisite amount of Cooler product. Thus, no additional trucks or trips were required to deliver California Cooler, and, therefore, the company did not incur any increase in gas and oil expense, maintenance on trucks or

cost for the purchase of the new trucks as a result of adding California Cooler as a product. By the same token, these expense items were not decreased when California Cooler ceased to be a product. No new employees were hired, no new equipment was purchased, and no new warehouse space was added for the California Cooler product.

In computing damages from the loss of the California Cooler line, Mr. Pohle did not reduce projected gross profits by expenses that remained unchanged in the face of the addition or deletion of the Cooler product. He did reduce the gross profit from projected California Cooler sales by "direct expenses," which include such things as sales commissions, advertising and promotional expenses, interest costs for financing inventory and receivables to the extent that these items were directly attributable to California Cooler. Brown–Forman contends that this was improper and that the proper measure of damages requires that a pro rata share of all general operating expenses be attributed to California Cooler sales in determining loss of profits from the termination of the agreement.

It is important to note that, although this issue arises as an admissibility of expert testimony problem, it is not really an expert witness/evidence problem in the classic sense. Rather, it is a problem concerning the substantive law of damages and, particularly, the measure of damages; Brown–Forman is arguing that, as a matter of law, damages may not be computed by ignoring expenses that the evidence shows were not affected by the addition or deletion of the California Cooler product. Thus, Brown–Forman contends that expert witness Pohle's conclusions concerning the loss of profits caused by the termination were improper as a matter of law and therefore not relevant and not admissible. We disagree with Brown–Forman's position; we believe it was proper for the jury to determine under all the evidence whether High Life was damaged and, if so, to what extent.

It was Mr. Pohle's expert opinion that the lost profits from September 29, 1987,

the date of notice of intention to terminate the Distributorship Agreement, to the end of 1989 was $111,731. Brown–Forman's expert, Ed Lynch, computed loss of profits by allocating a pro rata share of all operating expenses to the California Cooler product; he concluded that the loss of profits for the same period were $2,157. On cross-examination, Mr. Lynch was asked to add back to his profit all operating expenses that he could not identify as being increased or decreased by California Cooler, and, upon doing so, he arrived at loss of profits for the period of $82,900. The jury returned a damage verdict of $91,000.

The jury was instructed pursuant to MAI 4.01. MAI 4.01 instructs the jury to "award plaintiff such sum, as you believe will fairly and justly compensate plaintiff for any damages you believe it sustained as a direct result of" the termination of the Distribution Agreement. This instruction properly puts to the jury the factual issue of which expenses were to be considered in determining the loss of profits. The trial court was correct in refusing to exclude or strike testimony of plaintiff's expert damage witness. The issue raised by Brown–Forman with respect to this evidence was an issue of fact for the jury rather than a question of the admissibility of evidence for the court.

■ Section 407.413.3 and the Distributorship Agreement both provide that High Life, as the prevailing party, may recover reasonable attorney's fees and the costs of the action. High Life has filed its Motion for Attorney's Fees, covering the period from the trial through the appeal to the court of appeals and to this Court, in the amount of $31,349.00 along with itemized statements setting forth the date, nature of services, person rendering the services, the hourly rates and the total charges for such services. Brown–Forman has filed its response to this motion asserting their basic claim that § 407.413 does not apply, and therefore attorney's fees should not be granted. We have resolved this issue in favor of High Life and against Brown–Forman. Brown–Forman's Response to the Motion for Attorney's Fees does not question the amount of the fees requested, but states that the motion is premature. We sustain High Life's Motion for Attor-

ney's Fees. It is ordered that further judgment shall be entered in favor of High Life Sales Company and against Brown–Forman Corporation in the amount of $31,349.00 covering attorney's fees from the end of the trial through the appeal and for the costs of this action.

We change the rule of law in Missouri concerning the enforceability of forum selection clauses, but we nevertheless affirm the trial court in its decision to refuse to dismiss so that Brown–Forman could re-file this lawsuit in Kentucky; we affirm the trial court's finding that § 407.413 applies to the Distributorship Agreement (thus Brown–Forman was not entitled to terminate the Distributorship Agreement); and, we affirm the trial court's refusal to exclude the testimony of plaintiff's expert damage witness.

All concur.