

# In the
# Missouri Court of Appeals
## Western District

TRACIE L. OSTERMEIER, ET AL.,

        Appellant,

v.

PRIME PROPERTIES INVESTMENTS
INC., ET AL.,

        Respondents.

WD82432

OPINION FILED:

DECEMBER 10, 2019

**Appeal from the Circuit Court of Cass County, Missouri**
**The Honorable R. Michael Wagner, Judge**

**Before Division Three: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge,**
**Anthony Rex Gabbert, Judge**

Tracie Ostermeier and Samantha Rice ("Appellants" collectively) appeal the circuit court's denial of their motion to amend the court's judgment to award attorney fees on their Missouri Merchandising Practices Act (MMPA) claims against Prime Properties Investments, Inc. /Robb Steinbeck ("Respondents" collectively). They also appeal the exclusion of evidence during trial that they contend was relevant to their claim for punitive damages. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

**Background and Procedural Information**

On September 17, 2015, Appellants filed a petition alleging they had been harmed by a bedbug infestation in apartments owned and leased by Respondents. Appellants filed an amended petition on December 23, 2015, and a second amended petition on March 31, 2016. The second amended petition alleged that, 1) Respondents negligently failed to provide habitable and sanitary living conditions to Appellants, free of bedbug infestation, and failed to eradicate the same during the course of Appellants' tenancy, 2) that Respondents violated the MMPA by continuing to demand rent monies from Appellants despite the harmful bedbug infestation, 3) that Respondents' intentional placement of Appellants in an apartment infested with bedbugs which bite humans and feed exclusively on blood constituted battery, 4) Respondents breached the implied warranty of habitability by leasing an uninhabitable apartment to Appellants, 5) Respondents breached their promise of quiet enjoyment of the leased premises, and 6) Respondents' conduct interfered with Appellants' possessory interest in the property and constituted trespass.

Trial on Appellants' claims began August 28, 2018, and ended August 30, 2018. Two claims were ultimately submitted to the jury – negligence and the alleged MMPA violations. The jury returned a verdict in favor of Appellants on both claims, awarding actual damages in the amount of $17,480 to Tracie Ostermeier and $2,520 to Samantha Rice. The jury did not find Respondents liable for punitive damages. The circuit court entered Judgment on the jury's verdict on September 5, 2018.

On September 19, 2018, Appellants moved to amend the judgment to add reasonable attorneys' fees pursuant to Section 407.025.1, RSMo 2016. Appellants requested fees in the amount of $184,555.69. On October 5, 2018, Appellants moved for a new trial on the issue of punitive damages only. On December 13, 2018, the court denied Appellants' motion for new trial

2

on punitive damages, and on December 27, 2018, denied Appellants' motion to amend the judgment to add attorneys' fees. The court entered final Judgment on December 30, 2018. This appeal follows.

## Standard of Review

Our standard of review is set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Schollmeyer v. Schollmeyer*, 393 S.W.3d 120, 122 (Mo. App. 2013). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 122-123.

## Point I

In their first point on appeal, Appellants contend the trial court erred as a matter of law in denying their motion to amend the judgment to add an award of reasonable attorneys' fees under Section 407.025.1. Appellants argue the court misapplied the standard set forth in Section 407.025.1 by allowing Appellants' representation by Legal Aid and pro bono attorneys to be the primary factor in denying fees. Further, Appellants argue that Section 407.025.1 requires a fee award based on the reasonable time spent by Appellants' counsel regardless of whether Appellants paid fees to their counsel. Appellants also contend that the court abused its discretion in denying attorneys' fees.[1]

"'Missouri courts adhere to the 'American Rule' which states that, ordinarily, litigants must bear the expense of their own attorney's fees.'" *Arcese v. Daniel Schmitt & Co.*, 504 S.W.3d 772,

---

[1] Both of Appellants' points on appeal are multifarious. Appellants combine into the same points relied on misapplication-of-law challenges with abuse of discretion challenges. These are distinct claims that must appear in separate points relied on in the Appellants' brief to be preserved for appellate review. *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014); 84.04(d). Nevertheless, as we prefer to decide cases on the merits where an appellant's argument is readily understandable, we exercise our discretion to review the merits of Appellants' claims.

787 (Mo. App. 2016) (quoting *Lett v. City of St. Louis*, 24 S.W.3d 157, 162 (Mo. App. 2000)). One common exception to the American Rule is where a statute authorizes a trial court to award attorney's fees. *Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 184 (Mo. App. W.D. 2002). Here, Section 407.025.1 provides that, "The court may, in its discretion … award to the prevailing party attorney's fees, based on the amount of time reasonably expended[.]"

> In denying Appellants' motion for attorneys' fees the circuit court stated:
>
> Court takes up Motion to Amend the Judgment to Add Award of Reasonable Attorneys Fess [sic]. Court after hearing oral argument, conducting research, considering the amount of time reasonably expended by the prevailing party's attorneys, and all other relevant facts including, but not limited to, the fact that plaintiff did not incur any legal fees in that plaintiff was represented by a legal aid attorney and an attorney working on a pro bono basis, DENIES motion.

We note that the trial court did not deny fees on the grounds that Section 407.025.1 disallows an award in this case; the court acknowledged Section 407.025.1's provision that fees are to be based on time reasonably expended.[2] Because the court denied fees after considering several factors, including that Appellants had Legal Aid/pro bono representation, we review the court's attorney fee ruling for an abuse of discretion. *Hill v. City of St. Louis*, 371 S.W.3d 66, 81 (Mo. App. 2012). Judicial discretion is abused when the court's ruling is against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice. *Id.* We deem the trial court an expert on attorney fees in a given case due its familiarity with all issues in the case and the character of the legal services rendered. *See Essex Contracting, Inc. v. Jefferson Cty.*, 277 S.W.3d 647, 656-57 (Mo. banc 2009) (quoting *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980)). The trial

---

[2] *See Selleck v. Keith M. Evans Insurance, Inc.*, 535 S.W.3d 779, 784 (Mo. App. 2017), in which the Eastern District compared different attorney fee statutes in the MMPA, noting that Section 407.025.1 expressly ties an award of attorneys' fees to the amount of time expended.

court may determine attorney fees without the aid of evidence. *Id.* "We presume an award of attorney's fees to be correct, and the complaining party has the burden to prove otherwise." *Hill*, 371 S.W.3d at 81 (internal citation omitted). We will only reverse if it is shown that the award of attorney fees was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice. *Id.*

Appellate courts have identified several factors trial courts should consider when making a determination as to reasonable attorney fees. *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 523 (Mo. banc 2009). These include: (1) the rates customarily charged by the representing attorneys and local attorneys who handle similar work; (2) the number of hours reasonably spent on the litigation; (3) the nature of the services provided; (4) the degree of necessary professional expertise; (5) the nature and importance of the subject matter; (6) the amount involved or the result obtained; and (7) "the vigor of the opposition." *Id.*

In *O'Brien v. B.L.C. Ins. Co.* a trial court awarded $1,000, without a hearing, for attorneys' fees pursuant to Section 407.546 (an MMPA statute) after a jury returned a verdict against the defendant for odometer fraud. 768 S.W.2d 64, 71 (Mo. banc 1989). On appeal, the plaintiff argued that the appropriate fee award should have been $28,000 based on the regular hourly rate of the participating attorneys. *Id.* Our Missouri Supreme Court discussed the factors necessary for consideration in awarding fees, and rejected the defendant's argument that client/attorney contingent-fee contracts should control such a determination stating, "Counsel are entitled to a reasonable fee, and are not limited to their agreed share of the client's recovery." *Id.* Significantly, in reversing the fee award and remanding to the circuit court with directions to determine an appropriate fee, the Court opined that, where the sense of the statute is that private litigants aid public authorities in enforcing the statutes by authorizing an award of attorney fees, fees must be

5

determined with consideration of the legislative intent that the cost of litigation not stand in the way of statutory enforcement. *Id.* at 72.

In *Berry v. Volkswagen Group of America, Inc.*, our Missouri Supreme Court affirmed an attorney fee award of over three million dollars in a class action suit brought under the MMPA, also affirming the trial court's addition of a multiplier which brought the total award to over six million dollars. 397 S.W.3d 425 (Mo. banc 2013). The Court found the record supported "that a multiplier was necessary to ensure a market fee that compensated class counsel for taking this case in lieu of working less risky cases on an hourly basis." *Id.* at 433. In finding no abuse of discretion in the trial court's award the Court stated:

> The MMPA's fundamental purpose is the 'protection of consumers,' and, to promote that purpose, the act prohibits false, fraudulent or deceptive merchandising practices. *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009); section 407.020. The MMPA is 'paternalistic legislation designed to protect those that could not otherwise protect themselves.' *Huch*, 290 S.W.3d at 725-26 (quoting *High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 498 (Mo. banc 1992) (citations omitted)). The legislature granted discretion to the trial court to award, 'in addition to damages, injunction or other equitable relief and reasonable attorney's fees.' Section 407.025. These remedial measures are designed not only to remedy violations of the MMPA, but also prospectively to deter prohibited conduct and protect Missouri citizens. *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 143 (Mo. banc 2005).

*Id.*

Moreover, the *Berry* Court emphasized the legislative goal of protecting citizens through remedying MMPA violations, and fostering that purpose by encouraging private counsel to engage in MMPA litigation through an award of attorneys' fees.

In *Selleck v. Keith M. Evans Ins., Inc.*, the Eastern District reversed a trial court's fee award to a prevailing MMPA litigant after concluding that, while the court discussed a variety of factors prior to determining the award, "[t]he words and tenor of the trial court's judgment suggest that

6

the contingent-fee arrangement may have been the sole factor in the trial court's decision, not merely a factor." 535 S.W.3d at 786. Selleck had claimed that the court erroneously used the contingent-fee arrangement Selleck had with his attorneys to dictate the fee award. *Id.* at 784. The Eastern District agreed finding that, although consideration of the fee agreement was not precluded, the contingent-fee agreement could not be the sole basis for the award. *Id.* at 786. The court stated:

> Although the trial court's judgment references 'other factors' considered when determining the reasonableness of the attorneys' fees requested by Selleck on his prevailing count, the trial court plainly rejected certain factors because of the contingent-fee agreement and seems to have minimized the relevance of the remaining factors given its ultimate finding that 'plaintiff was not charged fees on an hourly basis ... and his testimony was that he had a contingent-fee agreement with counsel.' The presence of the contingent-fee agreement appears to undercut the other factors mentioned in the trial court's judgment and findings. It may be that the trial court indeed analyzed the contingent-fee agreement as merely one of many factors, and not the sole factor, for determining the reasonableness of Selleck's motion for attorneys' fees. However, the written judgment, when viewed in its entirety, presents a limited rather than broad consideration of the contingent-fee agreement.

*Id.*

We find the same true here. Although the court's order states that several factors were considered in denying fees, the court's complete denial of all fees with little explanation, but express reference to Appellants' Legal Aid/pro bono representation, strongly suggests that Appellants' lack of fee obligation was most influential in the court's decision.

We find our Supreme Court's holdings regarding contingent-fee agreements in MMPA cases instructive here as, in the context of the remedial purposes of the MMPA, there is no significant difference between attorney/client contingent-fee agreements and attorney/client agreements requiring no fees but authorizing the pursuit of fees for successful litigation. In

7

particular, we find it significant that in the contingent-fee cases, the Supreme Court and appellate courts have held that an award of fees is not necessarily limited by the amount of the attorney's contingent-fee agreement with the client. By allowing an award of statutory attorney's fees in excess of the agreed contingent fee, Missouri courts have permitted an award of fees *for which the client is not directly liable*. This is no different from the situation where the client is represented by Legal Aid or pro bono counsel. Fee-shifting clauses in statutes are considered to serve at least two important functions – to secure enforcement of the underlying statute at issue and increase the costs to violators for greater deterrent effect. *Arcese*, 504 S.W.3d at 789. Denying an attorney fee award because a litigant is represented by Legal Aid or pro bono counsel thwarts the remedial purposes of the MMPA's fees shifting provisions. The statutory scheme of the MMPA shows a clear legislative intent to allow attorney compensation regardless of whether a party aggrieved by an MMPA violation has an obligation to pay such fees.

The attorney general has always been statutorily authorized to pursue court enforcement of the MMPA's provisions. § 407.100. The attorney general may recover restitution "to restore to any person who has suffered any ascertainable loss." § 407.100.4. The attorney general may also seek a punitive civil penalty against a defendant, payable to the State, of up to $1,000 per MMPA violation. § 407.100.6. When the attorney general prevails in an action, included in the defendant's judgment "in addition to restitution and costs, [is] an amount equal to ten percent of the total restitution awarded, or such other amount as my be agreed upon by the parties or awarded by the court." § 407.140.3. This amount is paid into the State treasury to the credit of the merchandising practices revolving fund. *Id.* "Money in the merchandising practices revolving fund shall be available for the payment of all costs and expenses incurred by the attorney general in the investigation, prosecution, and enforcement of the provisions of this chapter[.]" § 407.140.2.

8

Notably, in spite of being a publically funded agency that enforces the MMPA free of charge to the benefit of aggrieved citizens, and that is statutorily authorized to recover additional money from offenders to facilitate enforcement of the MMPA, the attorney general *also* may recover attorney's fees. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 771 (Mo. banc 2007).[3] We find it apparent from these statutory allowances that one of the purposes for which the Missouri legislature designed the MMPA's fee shifting provisions was to increase costs to violators for greater deterrent effect.

Section 407.025 allows a private citizen who has suffered an ascertainable loss as a result of an MMPA violation to act as a "private attorney general" and pursue statutory enforcement.[4] Where private individuals pursue enforcement of the MMPA, the attorney general and the taxpayers are relieved of that burden. Private litigants, however, do not have the costs of enforcement taxpayer funded or funded through the merchandising practices fund. Yet, prevailing private MMPA litigants may be awarded attorney fees "based on the amount of time reasonably expended" by counsel. *Id.* We find that, because an aggrieved person may obtain restitution for MMPA violations via the attorney general with no obligation to pay for those services, and the attorney general may statutorily recover attorney's fees above and beyond penalties designed to cover costs and expenses in investigating and prosecuting MMPA violations, it would be contrary to the remedial purposes of the fee shifting provisions of the MMPA to allow a private citizen's

---

[3] "In any action brought under the provisions of section 407.100, the attorney general is entitled to recover as costs, in addition to normal court costs, the cost of the investigation and prosecution of any action to enforce the provisions of this chapter." § 407.130. It has long been held that this includes an award of attorneys' fees. *Hess*, 220 S.W.3d at 771.

[4] "In conjunction therewith, effectuating this legislative purpose is not confined to the Office of the Attorney General, but private citizens injured by MMPA violations 'have a right to act as "private attorneys general" for purposes of enforcing it.' *Arcese*, 504 S.W.3d at 789 (quoting *Hess*, 220 S.W.3d at 769).

lack of obligation to pay for legal fees to prevent attorney compensation in a case successfully enforcing the MMPA.[5]

Here, Stinson LLP partnered with Legal Aid of Western Missouri to litigate this case on a pro bono basis, with express written contracts with the client providing that if they were successful in the litigation, the client would work with Legal Aid and the law firm to recover attorney fees from the violator. There is really no dispute that Legal Aid does not have the funds or staff attorneys needed to handle all of the demand for their services and relies on private lawyers and law firms to volunteer to assist their clients in protecting the client's rights. Even then, more than half of the applicants who qualify for Legal Aid of Western Missouri assistance are turned away.[6] A holding that private law firms who agree to take these cases are prohibited by law from receiving any recourse for the time expended merely because they are acting on behalf of Legal Aid could have a chilling effect on the willingness of lawyers and law firms to take on this representation. Such an effect would be contrary to the fee shifting purpose of helping secure enforcement of the MMPA. *See Arcese*, 504 S.W.3d at 789.

---

[5] In *Ehlert v. Ward* the Missouri Supreme Court found that attorney fees could not be awarded to a prevailing plaintiff in a Truth in Lending Act claim because the plaintiff was obligated to pay no fees due to Legal Aid representation. 588 S.W.2d 500, 504-505 (Mo. banc 1979). The Court stated that attorney fees were unnecessary to make the plaintiff whole and expressed concern that unjust enrichment could result where the plaintiff's attorneys were not "parties" and could receive no direct award. *Id. Ehlert* did not involve the MMPA which evidences a deterrent and even punitive intent with its penalty and fee shifting provisions and clearly allows for attorney compensation for successful MMPA litigation regardless of an aggrieved citizen's obligation to pay fees. *See also In re Marriage of Ghaddis*, 632 S.W.2d 326 (Mo. App. 1982). As Appellants have contractual obligations to remit any fee award to the attorneys who expended time successfully litigating the MMPA claims, we find no concern for unjust enrichment.

[6] *See* Legal Aid of Western Missouri 2018 Annual Report at 8, https://lawmo.org/wp-content/uploads/2019/04/2018-Annual-Report-Booklet-REDUCED.pdf ("Because of funding and staffing limitations, we turn away more than half of the applicants who qualify for our help.").

We conclude that, to the extent the circuit court's denial of Appellants' attorneys' fees was based on Appellants' lack of obligation to reimburse counsel for fees, the court abused its discretion.

Appellants' first point on appeal is granted.

**Point II – Punitive Damages**

In Appellants' second point on appeal, Appellants contend the court misapplied the law and abused its discretion by maintaining a blanket exclusion of Respondents' willful failure to treat bedbug infestations in several other buildings in close proximity to Appellants' building. Appellants argue that exclusion of evidence showing a pattern and practice of misconduct and harm to others in the same apartment complex unfairly and materially prejudiced Appellants' ability to prove their claims for punitive damages under the MMPA and common law as submitted in the jury instructions.

"'We review the trial court's admission or exclusion of evidence under a deferential standard of review.'" *McGuire v. Kenoma*, LLC, 375 S.W.3d 157, 183-184 (Mo. App. 2012) (quoting *Ziolkowski v. Heartland Regional Medical Center*, 317 S.W.3d 212, 216 (Mo. App. 2010)). On appellate review, the issue is not whether the evidence was admissible or should have been excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence. *McGuire*, 375 S.W.3d at 184. "A circuit court has broad discretion in determining the admission of evidence [.]" *Lewellen v. Franklin*, 441 S.W.3d 136, 149 (Mo. banc 2014). A court abuses its discretion only when the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion."

11

*State v. Quick*, 334 S.W.3d 603, 609 (Mo. App. 2011) (citing *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)).  Even if we find an abuse of discretion, we "will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative."  *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo. App. 2009).

Appellants argue that the court erroneously refused evidence necessary for Appellants' punitive damages claims.  They argued throughout trial that, in order to show Respondents' pattern and practice of willful and reckless disregard of others and harm to others to support punitive damages, they were entitled to introduce evidence of bedbug infestation in apartment buildings other than Appellants' building.  Appellants allege that, throughout trial, the court maintained that Appellants' evidence of harm to others, other tenants' complaints, multiple infestations, and Defendants' denials of the same were not relevant to Appellants' case.

The record reflects that the court carefully considered this issue.  When Appellants asked to reference bedbug infestations in buildings other than Appellants' in opening, the court stated that the evidence might be appropriate for impeachment, but prohibited Appellants from discussing the information initially with the jury stating,

> [A]fter I hear the evidence from the expert, I may or may not allow certain things.  Again, if the expert testifies to me that these – some of these locations are relevant to show, I may let that in, but I don't know what that is going to be yet and I hate to have it out there at this point until I hear what the expert says.  I don't know if the defendants are going to open the door, I don't know what the experts are going to say, but I don't want to just start off saying there were bedbugs galore.  I don't think that is proper at this point.

In response, Appellants' argued that they pled an MMPA claim which regarded a pattern and practice of misrepresentation and non-treatment of the bedbug issues and should be able to bring in "me too witnesses" for that purpose.  The court indicated,

12

I don't know that yet until I hear what you have to say, but I don't want to open that up in opening and then later on say that was wrong and then you are in a spot – where I won't let you present certain evidence. I don't want the jury saying, 'Well, plaintiffs said they are going to show us this and they didn't show us this. Those are the kind of issues I am worried about.

Plaintiff's expert, Forrest St. Aubin, testified that for fifty-eight years he had been a professional entomologist, a career which involved the scientific study of insects and related organisms. He testified that through work with the Environmental Protection Agency, he had training in entomology and pesticides. He presently teaches pest control operators and from the mid 1980's to 1993 owned SUMA Pest Management Services, LLC. He sometimes testifies as an expert in litigation regarding entomology issues.

When asked if, in a multi-unit apartment building, bedbugs can move from apartment to apartment he stated, "Absolutely they will." He testified that, generally speaking, they move through the walls by getting behind baseboards at the bottom of a wall and hiding behind electrical receptacles and switches. He testified that it was quite common in his experience for bedbugs to move between units in a multi-unit building. He stated that, even after a host vacates the premises, bedbugs can live in a sort of hibernation for months until they sense $CO_2$, which is exhaled by mammals. He testified that bedbugs can also move from building to building if, for example, children from a bedbug infested apartment go to another building for a sleepover. Such transfers also occur when someone moves from an infested apartment and moves their infested furniture with them. He described that bedbugs could be effectively exterminated, although it is an "extremely time consuming" process to pinpoint where the problem is and how extensive. He said that, if there is a report in a multi-unit building in one unit, the proper method to attack the building

13

would be to investigate all units around it. He stated that failing to do so would be unsatisfactory, and "asking for trouble, you are asking for a spread of the infestation."

St. Aubin testified that he reviewed Defendant Steinbeck's deposition testimony and concluded that "the methods he used only beg for expansion of the infestation" "because they were in no way consequential to control." He testified that in a situation where there might be a multi-unit complex, the whole complex is at risk if bedbug complaints are not taken seriously. He stated that, in his review of Steinbeck's testimony, Steinbeck did not take every complaint at face value and investigate. When asked why it was not unusual that Appellant lived in her apartment for one year before experiencing bedbugs, the court sustained Respondents' objection as to "speculation" when St. Aubin began to testify, "Well, they were probably in the building …." The court did not grant the mistrial requested by Respondents.

Appellants made an offer of proof regarding the foundation they wanted St. Aubin to provide so as to allow evidence that other complaints and infestations were present in other buildings in the apartment complex, and that Defendants' pattern and practice was to ignore/improperly respond to those issues. In that offer of proof, St. Aubin testified that it was "absolutely essential" to treat adjoining units in an apartment building when there were complaints of various tenants in multiple apartments. When asked about if there are complaints about bedbugs across the street in the same apartment complex, St. Aubin testified, "That's a difficult thing to answer," indicating that it was impossible to determine where the bedbugs originated. He stated that it was entirely possible that the bedbugs could spread to every building in the complex, and that the entire complex will become infested if multiple complaints are ignored.

On cross examination, St. Aubin testified that it was conceivable that the bedbugs could have been brought in from the mall, a movie theater, or the airport -- that it was "absolutely"

14

difficult to rule out that the bedbugs could have originated from any of those places. He testified he had no idea where the bedbugs in Appellants' apartment came from. He testified that, if Appellant Rice had sleepovers with other children, it was possible she could have brought them into the apartment. It was also possible that, during the period Appellants' apartment was being treated, bedbugs were brought back in from the same source or a different source.

After the offer of proof from St. Aubin, the court expressed the following:

> Again, this is what I am struggling with here from the testimony I have heard and the offer of proof and earlier today there is no doubt that, again, I don't want to dwell upon it and talk about injuries and everything else, but the adjoining units, downstairs, upstairs, next door, I think that is relevant and I think it was correct to let the jury hear that these other people – there were bedbugs in these adjoining rooms because from what the witness testified to they can hide in the walls, through the holes they could creep through and everything. My problem is where to draw the line because if we say, okay, I will let in folks from and it is very possible somebody in 904 walked over there to 2205 and they spent the night like the kids did, it is possible that happened, it is possible somebody in Minnesota came traveling in and spread those bedbugs. My problem I have got is where to draw the line. I have to weigh the probative value versus the time delay, the prejudice, those type of things. How much are we going to gain by spreading this out and bringing in people from this whole complex. And it is true the bedbugs could have come from anybody in that place, but when we have a five-day jury trial, I have got to limit it somewhere. … I am just worried about the vast – because these things could have come from anywhere. I mean, the mailman could have brought them and should he have checked out the mailman, maybe, but I don't know. I have got to limit it somewhere. I think for purposes of this trial I have got to limit it to the building of 2205 and the adjoining rooms in that immediate area or that vicinity unless there is some kind of stronger evidence like the witness testified it's difficult to answer.

April Everett testified before the jury that from 2011 to 2013 she lived in building 2205 at Twin Oaks apartments. She then moved across the street to building 1003 because the new apartment had three bedrooms and she had two boys who needed their own rooms. She testified that she had friends living in building 2205, including Appellants, and observed bedbugs at Appellants' home and another friend's home. She stated that she sat on Appellants' couch and

bedbugs crawled all over her and bit her. Her children and Appellant Ostermeier's daughter had play dates and sleepovers where they would sometimes spend the night at each other's homes. These play dates and sleepovers continued after Everett moved to building 1003.

Appellants made an offer of proof with testimony from April Everett for the purpose of showing that Respondents' pattern and practice was to ignore bedbug infestations in other buildings of the apartment complex as well. Everett testified that, after moving over to building 1003 she experienced bedbugs all over her apartment. Her neighbors in that building also had bedbugs. Everett advised Respondent Steinbeck that her new apartment was infested with bedbugs, but he never came out and treated and never hired a professional to do so. He gave Everett spray that she and her boyfriend applied. Steinbeck told her it was a strong spray and not to breathe it in. Everett and her boyfriend threw their mattresses and box springs in the outside dumpster where other tenants had thrown theirs. The couple treated two or three times because the bedbugs kept coming back. Respondent Steinbeck was aware that bedbug-infested furniture and items were being placed in the dumpster outside the building.

After hearing this offer of proof, the court continued to exclude testimony related to bedbugs in apartment buildings other than Appellants' building. Concerns raised by the court regarded the "speculation of the other units where kids may have been coming across the street." The court agreed that the evidence had probative value, "but I don't know if the probative value outweighs the time delay and the prejudice." The court stated that Respondents' pattern and practice, methodology and protocols could be addressed by Respondents' actions and inactions regarding Appellants' building. Further, the court noted that the suit was not a class action suit.

We find no abuse of discretion in the court's limitation of the evidence to Appellants' apartment building. Given the evidence, the court's determination that Respondents' pattern,

16

practice, methodology, and protocols with regard to bedbug infestations could be addressed through evidence regarding Appellants' apartment and units within her entire building was not clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice or indicate a lack of careful consideration. St. Aubin's testimony was that it is very hard to determine the origin of bedbugs, they are very hard to eradicate, and re-infestations may come from outside sources. Everett's testimony, coupled with St. Aubin's, suggested Everett, Everett's children, Appellants, or other building 1003 residents could have carried bedbugs from building 2205 to building 1003, or vice versa, and Everett and/or Appellants could have re-infested each other's premises, suggesting that Respondents' may have only really been fighting one battle. Given the offers of proof, we find it reasonable that the court limited the evidence to avoid undue prejudice.

On appeal, Appellants argue that the additional evidence would have been relevant to establish Respondents' state of mind, and therefore the Respondents' liability for punitive damages. We find it significant in this regard that Appellants offers of proof focused largely, if not exclusively, on the *existence* of a bedbug infestation in other buildings, and/or other tenants' *complaints* concerning bedbugs, rather than on *the Respondents' response* to any complaints; yet the Respondents' actions in response to any complaints would have been the most germane evidence concerning punitive damages. Further, we note that during her offer of proof Everett testified that Respondents *did* respond to her complaints of bedbugs by supplying her with pesticide to apply, making her circumstances distinguishable from the Appellants'. Moreover, even if the court erroneously excluded the evidence, we find nothing within the offers of proof that would have changed the jury's determination that punitive damages were not appropriate.

Appellants' second point on appeal is denied.

17

**Conclusion**

We conclude that the circuit court abused its discretion in denying Appellants' motion to amend the Judgment to award attorney fees. The court did not abuse its discretion in excluding evidence regarding bedbug infestations in apartment buildings other than Appellants' building.

The circuit court's judgment is affirmed in all respects, except for its determination denying an award of attorney fees, which is reversed. This matter is remanded to the circuit court for reconsideration, consistent with this Opinion, of Appellants' motion to amend the Judgment to award attorney fees.[7]

_Anthony Rex Gabbert_
Anthony Rex Gabbert, Judge

All concur.

---

[7] Appellants' Motion for Award of Attorney's Fees on Appeal was taken with the case. "'The legislature intended that in any action filed under the MMPA the trial court within its discretion may order an 'injunction or other equitable relief and reasonable attorney's fees.'" *Saavedra v. CHW Group Inc*., 504 S.W.3d 141, 142 n.1 (Mo. App. 2016) (quoting *Berry*, 397 S.W.3d at 433). "Thus, although this Court has authority to grant an amount of attorney's fees on appeal, we believe 'in most cases that the trial court is better equipped to hear evidence and argument on the issue and determine the reasonableness of the fee requested.'" *Id*. Therefore, we grant the motion for attorney's fees and remand for the trial court to determine the reasonableness of Appellants' request for attorney's fees on appeal.