**MONSANTO COMPANY,**
**Plaintiff–Appellee,**

v.

**Homan MCFARLING, Defendant–Appellant.**

**No. 01–1390.**

United States Court of Appeals, Federal Circuit.

Decided: Aug. 23, 2002.

Rehearing En Banc Denied: Oct. 16, 2002.*

* Dyk, Circuit Judge, did not participate in the vote.

Seth P. Waxman, Wilmer, Cutler & Pickering, of Washington, DC, argued for

plaintiff-appellee. On the brief was Joseph C. Orlet, Husch & Eppenberger, LLC, of St. Louis, MO. Also of counsel on the brief was Douglas P. Matthews, Frilot, Partridge, Kohnke & Clements, of New Orleans, LA.

Jim Waide, Waide & Associates, P.A., of Tupelo, MS, argued for defendant-appellant.

Before NEWMAN, CLEVENGER, and BRYSON, Circuit Judges.

Opinion for the court filed by Circuit Judge PAULINE NEWMAN. Dissenting opinion filed by Circuit Judge CLEVENGER.

PAULINE NEWMAN, Circuit Judge.

Mr. Homan McFarling appeals the grant of a preliminary injunction by the United States District Court for the Eastern District of Missouri,[1] prohibiting Mr. McFarling, *pendente lite*, from using the plant genes and seed obtained from crops grown from Monsanto Company's patented soybean seed having the brand name Roundup Ready. We conclude that the district court acted within its discretion in granting the preliminary injunction.

## BACKGROUND

Monsanto developed genetically modified plants that are resistant to glyphosate herbicides such as Roundup® brand herbicide. The herbicide can then be sprayed broadly in planted fields, killing the weeds but not harming the resistant crops. This results in substantial savings in labor costs for weed control. Monsanto's United States Patents Nos. 5,633,435 and 5,352,605 claim the glyphosate-tolerant plants, the genetically modified seeds for such plants, the specific modified genes, and the method of producing the genetically modified plants.

Monsanto authorizes various companies to manufacture the patented seeds, which are then sold to farmers. Monsanto requires that sellers of the patented seeds obtain from the farmers/purchasers a "Technology Agreement," and the farmers pay a license fee to Monsanto of $6.50 per 50–pound bag of soybean seed. Mr. McFarling, a farmer in Mississippi, purchased Roundup Ready® soybean seed in 1997 and again in 1998; he signed the Technology Agreement and paid the license fee for each purchase. The signature line is immediately below the following statement: "I acknowledge that I have read and understand the terms and conditions of this Agreement and that I agree to them."

The agreements include the requirement that the seeds are to be used "for planting a commercial crop only in a single season" and direct the licensee not to "save any crop produced from this seed for replanting, or supply saved seeds to anyone for replanting." Mr. McFarling does not dispute that he violated the terms of the Technology Agreement. He saved 1,500 bushels of the patented soybeans from his harvest during one season, and instead of selling these soybeans as crop he planted them as seed in the next season. He repeated this activity in the following growing season, and stated that unless enjoined he intended to plant soybeans saved from the 2000 harvest in 2001. McFarling paid no license fee for this saved soybean seed, which retained the genetic modifications of the Roundup Ready® seed.

---

**1.** *Monsanto Co. v. Homan McFarling*, No. 4:00CV84 CDP (E.D.Mo. Apr. 13, 2000) (order denying motion to dismiss for lack of personal jurisdiction); (Mar. 21, 2001) (order granting motion to stay); (April 18, 2001) (opinion and order granting preliminary injunction).

Monsanto filed suit in the Eastern District of Missouri, charging patent infringement and breach of contract, and seeking a preliminary injunction. Mr. McFarling challenged the Missouri court's jurisdiction, and raised various counterclaims and defenses including charges of antitrust violation, patent misuse, and violation of the Plant Variety Protection Act, 7 U.S.C. § 2321 *et seq.* (PVPA). The district court interpreted the argument concerning violation of the PVPA as a request for declaration that the patents are invalid or unenforceable, granted McFarling's motion to stay the proceeding pending review by the Supreme Court of this court's ruling that plant seeds and seed-grown plants are within the subject matter of § 101 of the Patent Act. The Court affirmed that ruling in *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508, 60 USPQ2d 1865 (2001).

The district court denied Mr. McFarling's motion to dismiss for lack of personal jurisdiction and granted Monsanto's motion for a preliminary injunction. This appeal followed.

## DISCUSSION

### *The Forum Selection Clause*

■ Mr. McFarling argues that the district court did not acquire personal jurisdiction over him based on the forum selection clause in the 1998 Technology Agreement. This clause was printed in capital letters, indeed the only provision of the Technology Agreement that is in all capital letters. All of the provisions of the Technology Agreement are on the same page, on the reverse side of the signature page:

THIS AGREEMENT IS GOVERNED BY THE LAWS OF THE STATE OF MISSOURI AND THE UNITED STATES (OTHER THAN THE CHOICE OF LAW RULES). THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, AND THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS, STATE OF MISSOURI, FOR ALL DISPUTES ARISING UNDER THIS AGREEMENT.

McFarling states that he never turned over the agreement,[2] and that he did not consent to jurisdiction in Missouri based on a forum selection clause that he did not intentionally sign. McFarling argues that he has no contacts with Missouri, and that the Missouri district court's exercise of personal jurisdiction violates his due process rights under the Fifth Amendment.

■ Whether a district court has personal jurisdiction of a defendant in a patent infringement action is subject to plenary review. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359, 58 USPQ2d 1774, 1776 (Fed.Cir.2001). The issue here is not the reach of a state's long-arm statute, but the effect of a forum selection clause whereby jurisdiction is obtained by contractual consent or waiver. Such a clause is enforceable unless the party challenging it clearly demonstrates that it is invalid or that enforcement would be unreasonable and unjust. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174,

**2.** The parties focus on the forum · selection clause in the 1998 agreement. Mr. McFarling states that the reverse side of the 1997 agreement was blank. Monsanto states that the 1997 agreement was a standard form and, like the 1998 agreement, included the forum selection clause as well as all other provisions of the Technology Agreement on the reverse side of the document, whose front side contains only the identity of buyer and seller and a statement of the crop and acreage to be · planted.

85 L.Ed.2d 528 (1985) (noting that the enforcement of freely negotiated forum selection provisions "does not offend due process" when the provisions are neither unreasonable nor unjust); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (holding that a forum selection clause requiring suit in a foreign court should be enforced unless the plaintiff attempting to avoid it "could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching").

The district court held that the forum selection clause of the Technology Agreement is valid and enforceable. Mr. McFarling, challenging this holding on the ground of fairness, refers to *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), in which the Court held enforceable a forum selection clause printed on a cruise ticket, but stated that "forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness." *Id.* at 595, 111 S.Ct. 1522. McFarling states that unlike a cruise ship that carries passengers to and from many places, he purchased, planted, and harvested the seeds, and executed the Technology Agreements, all in Mississippi, and thus that Mississippi is clearly the fairest forum. He states that the plaintiffs in *Carnival* conceded that they had notice of the forum selection provision, but that he did not have notice because he did not read the back of the agreement. McFarling cites *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), for the proposition that minimum contact jurisdictional standards are not met unless the defendant performed an act "purposefully directed toward the forum State," and argues that his

"negligent" signing of the agreement was not purposeful. The district court correctly viewed the issue as one of validity of the contract provision, not an issue of minimum contacts.

Forum selection clauses are valid and accepted unless they are clearly unreasonable or fraudulent. Monsanto argues that the clause is reasonable because of Monsanto's legitimate interest in litigating disputes arising from these Technology Agreements in the venue of its principal place of business, one of the justifications asserted by the cruise line in *Carnival.* Monsanto also states that this common venue enhances judicial efficiency, produces greater uniformity of result, and decreases litigation costs.

■ The district court found that Mr. McFarling did not dispute that his ignorance of the clause was solely the result of his voluntary failure to read what he signed. A party who signs an agreement is bound by its terms, unless he was fraudulently induced not to read it or was fraudulently misled as to its content or significance. *See Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322, 45 USPQ2d 1819, 1822 (Fed.Cir.1998) (applying California law that a person is bound to a written agreement that he signs but neglects to read). Both Missouri and Mississippi contract law reflect this universal rule, making it unnecessary to consider choice of law issues. *See, e.g., Binkley v. Palmer,* 10 S.W.3d 166, 171 (Mo.Ct.App.1999) ("It has long been settled in Missouri that absent a showing of fraud, a party who is capable of reading and understanding a contract is charged with the knowledge of that which he or she signs."); *Oglesbee v. National Security Fire & Casualty Co.,* 788 F.Supp. 909, 913 (S.D.Miss.1992) ("Under Mississippi law, unless a party was induced not

to read the contract or have it read to him by fraudulent representation made by another party, he will be required to abide by its terms."). McFarling's argument that his voluntary failure to read the forum selection clause entitles him to exemption from its effect is unsupported by any law. Due process as to these issues is satisfied when a party consents by contract to personal jurisdiction in a selected forum. Moreover, McFarling has failed to demonstrate that the choice of Missouri as the forum is unreasonable. The district court correctly exercised personal jurisdiction over McFarling.[3]

### The Injunction Pendente Lite

■ The district court granted Monsanto's motion for a preliminary injunction, on Mr. McFarling's statement that he would otherwise continue to save soybeans from his crop and plant them as seed, contrary to the agreements he signed. We review the grant of a preliminary injunction on the standard of abuse of discretion. *See, e.g., H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387, 2 USPQ2d 1926, 1927 (Fed.Cir.1987). A district court abuses its discretion if it "made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Novo Nordisk of North America, Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1367, 37 USPQ2d 1773, 1775 (Fed.Cir.1996).

■ The general rule for grant of a preliminary injunction is that a party must establish (1) a reasonable likelihood of success on the merits; (2) irreparable harm,

---

**3.** We take note of the theory of our colleague in dissent, who argues that this is a contract of adhesion and therefore unenforceable. The dissent states that no court in the past thirty years "has enforced a forum selection clause against a defendant who has acceded to an adhesion contract." If the term "contract of adhesion" is understood to mean a contract that a court decides is unenforceable because it is unconscionable, then obviously no such contracts will be enforced. If, on the other hand, the term refers to form contracts that are not subject to negotiation, forum selection clauses in such contracts have often been enforced. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). For example, in *Northwestern National Insurance Co. v. Donovan,* 916 F.2d 372 (7th Cir.1990) the court enforced a forum selection clause in what it characterized as an adhesion contract between individual investors and a large insurance company. The court referred to "the widespread judicial suspicion of the form contract—the dreaded 'contract of adhesion,'" and observed that they are generally upheld (citing cases), remarking that "Ours is not a bazaar economy in which the terms of every transaction, or even of most transactions, are individually dickered; even when they are,

standard clauses are commonly incorporated in the final contract, without separate negotiation of each of them." *Id.* at 377. The court rejected the contention that failure to read a forum selection clause, in the absence of fraud, can negate its enforcement. *Id.* at 378 ("If they make a practice of signing contracts without reading them, they must bear the consequences.")

Our colleague in dissent also proposes that since Mr. McFarling says he didn't read the forum selection clause he shouldn't be bound by it. This theory is somewhat ingenuous in this case, for all of the provisions of the Technology Agreement are on the obverse, not simply the forum selection clause (which is the only provision printed in all capital letters). Mr. McFarling does not deny that he knew of the provision that prohibited saving crop as seed, for example. Nor does Mr. McFarling, a businessman whose business is farming, state that he could not understand his acknowledgment that "I have read and understand the terms and conditions of this Agreement and that I agree to them," when all the terms and conditions are together on the obverse page.

or harm not readily remediable monetarily; (3) a balance of hardships tipping in favor of the complainant; and (4) that the public interest is not disserved by the injunction. *See, e.g., We Care, Inc. v. Ultra-Mark Int'l Corp.*, 930 F.2d 1567, 1570, 18 USPQ2d 1562, 1564 (Fed.Cir.1991); *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195–96 (Fed.Cir. 1988). The court must balance these four factors, as their relative weights warrant, in service to the interest of justice.

On appeal, Mr. McFarling challenges the district court's analysis of only one of the four factors: the likelihood of Monsanto's success on the merits. McFarling does not now challenge the validity of Monsanto's patents; instead, he argues that the Technology Agreements constitute an illegal restraint of trade, in violation of the Sherman Act and in misuse of the patents, and thus that the patents are unenforceable. McFarling also argues that the first sale doctrine prohibits the contractual restraint on producing his own seed.

### 1.

■ First, Mr. McFarling argues that the Technology Agreements create an illegal tying arrangement by requiring farmers to buy new Roundup Ready® seed each year instead of allowing them to produce their own Roundup Ready® seed from the prior year's crop. McFarling cites *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), for the proposition that a tying arrangement violates the Sherman Act when the seller exploits "its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase else-where on different terms." *Id.* at 12, 104 S.Ct. 1551. According to McFarling, the tied product is a fresh supply of Monsanto's Roundup Ready® seed in future years, while the tying product is the original purchase of Roundup Ready® seed. McFarling states that he does not want to buy future Roundup Ready® seed, because he can produce his own genetically modified Roundup Ready® seed. McFarling also states that even if these restrictions do not constitute antitrust violations, the requirement that farmers buy new seed each year impermissibly broadens the patent grant, with anti-competitive effect.

Mr. McFarling further argues that the Technology Agreements constitute illegal agreements among competitors, referring to the agreements between Monsanto and its local distributors whereby the local sellers must require farmers to enter into the Technology Agreements as a condition of buying the Roundup Ready® seed. McFarling cites *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), for the proposition that agreements among competitors to fix the material terms of a sale are illegal. As a result of such alleged collusion, McFarling states that farmers in the United States pay higher prices for Roundup Ready® seed than do farmers in Argentina. Monsanto states that as the patent holder it decides unilaterally the terms on which its patents are licensed and its product sold under the Technology Agreements. Monsanto explains that the seed companies that are licensed by Monsanto to produce and sell the modified soybean seed have no control over the terms of the Technology Agreements that Monsanto requires of farmers who choose to purchase the Monsanto seed.

The district court found that Mr. McFarling was not likely to succeed on his

Sherman Act or patent misuse claims, that he had not presented any evidence raising a substantial question as to whether the Technology Agreements constitute a form of unreasonable or illegal restraint of trade. The district court's finding is not challenged, that there was no obligation upon Mr. McFarling to buy future seed as a condition of buying seed in the present. The court found that there were no impediments preventing Mr. McFarling from switching to other soybean seeds, the court recognizing that there are over two hundred commercial sources of soybean seed, including several herbicide-resistant soybeans.

▆ A purchaser's desire to buy a superior product does not require benevolent behavior by the purveyor of the superior product. Nor does an inventor of new technology violate the antitrust laws merely because its patented product is favored by consumers. *See Abbott Labs. v. Brennan*, 952 F.2d 1346, 1354, 21 USPQ2d 1192, 1199 (Fed.Cir.1991) ("The commercial advantage gained by new technology and its statutory protection by patent do not convert the possessor thereof into a prohibited monopolist.")

In accordance with the Technology Agreement, the purchaser agrees to use the purchased seed for the purpose of growing crops and not for the purpose of producing new seed. In *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 24 USPQ2d 1173 (Fed.Cir.1992) this court held that use of a patented product "in violation of a valid restriction may be remedied under the patent law, provided that *no other law prevents enforcement of the patent.*" *Id.* at 701, 24 USPQ2d at 1174. A restriction on use to make additional patented product, to constitute an antitrust violation, must meet the require-

ments of such violation and be outside the scope of the patent grant. *See General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81, 39 USPQ 329, 330 (1938). The district court correctly held that Mr. McFarling has not shown a reasonable likelihood of success on antitrust/misuse grounds; the record does not support Mr. McFarling's theory that he is required to buy future patented seeds from Monsanto in order to buy present patented seeds.

### 2.

▆ As a second ground for challenging the agreements, Mr. McFarling states that the contractual prohibition against using the patented soybeans to produce additional seeds for planting by the farmer violates the doctrines of patent exhaustion and first sale, and that the parties could not enter into an enforceable contract that has this effect. In support, McFarling cites the statement in *United States v. Univis Lens Co.*, 316 U.S. 241, 249, 62 S.Ct. 1088, 86 L.Ed. 1408, 53 USPQ 404, 407 (1942), that when a patented product has been sold the purchaser acquires "the right to use and sell it, and ... the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." It follows, McFarling argues, that once Monsanto sold the patented seeds to McFarling, its patent rights on the seeds and their products were exhausted and could not be restricted by agreement. Monsanto responds that it is within the scope of Monsanto's patent rights to prevent others from making, for the purpose of planting, a new batch of patented seeds from the purchased seeds.

The restrictions in the Technology Agreement are within the scope of the

patent grant, for the patents cover the seeds as well as the plants. The "first sale" doctrine of exhaustion of the patent right is not implicated, as the new seeds grown from the original batch had never been sold. The price paid by the purchaser "reflects only the value of the 'use' rights conferred by the patentee." *B. Braun Medical Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426, 43 USPQ2d 1896, 1901 (Fed.Cir.1997). The original sale of the seeds did not confer a license to construct new seeds, and since the new seeds were not sold by the patentee they entailed no principle of patent exhaustion.

**3.**

■■ McFarling argues that the contractual prohibition against using the patented seed to produce new seed for planting, when he produced only enough new seed for his own use the following season, violates section 2543 of the PVPA, which permits farmers to save seeds of plants registered under the PVPA.

The PVPA and the Patent Act are complementary forms of statutory protection of plant "breeders' rights." Utility patents under Title 35 provide rights and privileges that differ from those provided by Plant Variety Protection certificates. In *J.E.M. AG Supply*, 534 U.S. at ——, 122 S.Ct. at 604–05, 60 USPQ2d at 1873–74, the Court held that utility patents are available to plants and seeds that meet the requirements of patentability, independent of and in addition to rights under the PVPA. The Court observed that one of the differences between the two statutes is that "there are no exemptions for research or saving seed under a utility patent." *Id.* at ——, 122 S.Ct. at 604, 60 USPQ2d at 1873. It is thus established that the right to save seed of plants registered under the

PVPA does not impart the right to save seed of plants patented under the Patent Act.

**4.**

Mr. McFarling complains that the price charged for Roundup Ready® seeds is higher than for other soybean seeds, and that it is cheaper for him to produce his own Roundup Ready® seeds. He also states that Monsanto sells Roundup Ready® seeds at a lower price in Argentina.

■■ We need not repeat that in a market economy a purveyor may charge the price that the product can sustain; there is no requirement that a patentee must lower his price to that of the less desired products he replaces. *See, e.g., E. Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 93, 22 S.Ct. 747, 46 L.Ed. 1058 (1902) ("The owner of a patented article can, of course, charge such price as he may choose...."); *Carter–Wallace, Inc. v. United States*, 196 Ct.Cl. 35, 449 F.2d 1374, 1383, 171 USPQ 359, 365 (1971) ("[A]s a general rule and absent any overriding unlawful conduct, patentees can charge for their patented products and licenses whatever the market will bear.") This aspect does not add weight to the antitrust arguments pressed by Mr. McFarling.

**CONCLUSION**

Mr. McFarling conceded that he violated the terms of the Technology Agreements. The district court found that Monsanto had a reasonable likelihood of success on the issues of infringement and breach of contract, and that it was unlikely that an antitrust violation would be found. We do

not discern error in these findings, and the other factors relevant to grant of an injunction *pendente lite* are not contested. We conclude that the district court did not abuse its discretion in granting the injunction.

*AFFIRMED.*

CLEVENGER, Circuit Judge, dissenting.

I respectfully dissent. It is an elementary principle of constitutional law that no court may render judgment upon one over whom the court lacks personal jurisdiction. The requirement that a court must have personal jurisdiction to render a valid judgment arises, in the case of a federal question, from the Due Process Clause of the Fifth Amendment and represents a restriction on judicial power as a matter of personal liberty. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Like other individual liberties, the right to due process may be waived, and a defendant by contract may consent to the jurisdiction of a court which otherwise would have no power over him. *Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964).

However, the conclusion that a defendant has surrendered his right to due process of law is not one that a court should reach casually. "In the civil area, the Court has said that '[w]e do not presume acquiescence in the loss of fundamental rights.' Indeed, in the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver.'" *Fuentes v. Shevin,* 407 U.S. 67, 94 n. 31, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (citation omitted) (quoting *Ohio Bell Tel. Co. v.*

*Pub. Util. Comm'n,* 301 U.S. 292, 307, 57 S.Ct. 724, 81 L.Ed. 1093 (1937) and *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)). Let us be clear what we hold by enforcing Monsanto's forum selection clause against McFarling: we hold that an accused infringer may surrender his right to due process in advance by signing a contract of adhesion—regardless of whether that accused infringer knew that by so doing he abandoned his constitutional rights.

It cannot seriously be disputed that by signing the Technology Agreement McFarling became attached to a contract of adhesion. Although the definition of an adhesive contract varies, Monsanto's own state of Missouri has defined an adhesive contract as "one in which the parties have unequal standing in terms of bargaining power (usually a large corporation versus an individual) and often involve take-it-or-leave-it provisions in printed form contracts." *High Life Sales Co. v. Brown–Forman Corp.,* 823 S.W.2d 493, 497 (Mo. 1992) (en banc). The Technology Agreement certainly meets these criteria: the terms printed on the reverse of the Technology Agreement are not subject to negotiation and Monsanto's billions of dollars in assets far exceed McFarling's alleged net worth of $75,000.

But the relative bargaining power of Monsanto and McFarling is not the only indicium of a contract of adhesion here. Courts are more likely to label a contract adhesive when its terms are lopsided in favor of the drafter and when the purchaser has no other practical source to turn for necessary goods, for these factors tend to erode the premise that the rights given up by the lesser party were surrendered freely and fairly. No one perusing the Technology Agreement can doubt that its

terms are decidedly one-sided in Monsanto's favor. A farmer signing the 1998 Technology Agreement did not merely agree to submit to the jurisdiction of the Eastern District of Missouri and to refrain from saving and replanting seed. Sale of Roundup Ready seed to the farmer was made on the condition that the farmer shall not use on that crop the glyphosate herbicides of any of Monsanto's competitors. The farmer further agreed that Monsanto's damages for saving and replanting seed shall include, in addition to Monsanto's other remedies, liquidated damages based on 120 times the applicable Technology Fee. The farmer further agreed to bear the costs of Monsanto's suit against him by paying all of Monsanto's legal fees and costs. By the terms of the Technology Agreement, all that the farmer received in exchange for these promises was the "opportunity" to purchase and plant Roundup Ready seed and the "opportunity" to participate in Monsanto's crop insurance programs. Should the farmer violate the terms of the Technology Agreement, these rights (which are not transferable without Monsanto's consent) terminate immediately and permanently, although the farmer's obligations to Monsanto do not. I do not mean to suggest that the substantive terms of the Technology Agreement are unenforceable. A patentee has every right to license its technology on only the most favorable terms possible and Monsanto is no exception. But the one-sidedness of the Technology Agreement's substantive terms provides strong evidence that the forum selection clause was imposed, rather than (even in the abstract sense) bargained for.

Another hallmark of the adhesion contract is that the purchaser cannot reasonably obtain the necessary goods or services on alternative terms from any other source. Monsanto widely licenses its patents on glyphosate resistance technology, and over 200 seed companies offer Roundup Ready soybean seed. But each and every one of those licenses requires that the ultimate consumer (the farmer) sign Monsanto's own Technology Agreement. While Monsanto's monopoly on glyphosate resistance technology may be an entirely lawful one, Monsanto's control of the market means that farmers have no place else to turn for glyphosate-resistant seed. Farmers may certainly obtain ordinary soybean seed without acceding to the terms of the Technology Agreement. However, in only a few short years since their introduction, Roundup Ready seeds now account for at least 66 percent of soybean acreage planted in the United States, testifying that despite the substantial added cost of the Technology Fee most farmers find glyphosate-resistant soybeans far more competitive than ordinary seed. Testimony adduced at the preliminary injunction hearing indicated that glyphosate-resistant soybeans are especially important to farmers like McFarling, because northeastern Mississippi harbors particular weeds that are difficult to control without glyphosate-based herbicides. Taken together, these facts indicate that farmers like McFarling have little choice but to sign the Technology Agreement if they wish to remain competitive in the soybean market.

I reiterate that the commercial terms of adhesion contracts are generally enforceable absent a showing of substantive unconscionability. But whether such a contract should be effective to extinguish those rights guaranteed by the Due Process Clause of the Constitution is another matter altogether. As the highest court of Monsanto's own state of Missouri has noted: "Many courts have refused to enforce

a forum selection clause on the grounds of unfairness if the contract was entered into under circumstances that caused it to be adhesive." *High Life Sales*, 823 S.W.2d at 497.[1] This reluctance is especially appropriate when, as here, the drafter of an adhesion contract wields the forum selection clause "offensively," seeking to deprive a defendant of the protection afforded by the courts to those who are not otherwise subject to their jurisdiction.

To be sure, the Supreme Court has yet to hold that adhesion contracts are ineffective to surrender rights granted by the Due Process Clause. But the Court's assessment of such surrenders has hardly been favorable. In *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Court considered an alleged waiver by an adhesion contract of the right to a prior hearing, another aspect of the personal liberty conferred by the Due Process Clause. The Court at length contrasted the alleged waiver of due process rights by an adhesion contract with the freely negotiated waiver in an earlier case, *Overmyer v. Frick:*

> In *D.H. Overmyer Co. v. Frick Co.*, the Court recently outlined the considerations relevant to determination of a contractual waiver of due process rights. Applying the standards governing waiver of constitutional rights in a criminal proceeding—although not holding that such standards must necessarily apply—the Court held that, on the particular facts of that case, the contractual waiver of due process rights was "voluntarily, intelligently, and knowingly" made. The contract in *Overmyer* was negotiated be-

tween two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was "not a case of unequal bargaining power or overreaching. The Overmyer–Frick agreement, from the start, was not a contract of adhesion." Both parties were "aware of the significance" of the waiver provision.

The facts of the present case are a far cry from those of *Overmyer*. There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

The Court in *Overmyer* observed that "where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the (waiver) provision, other legal consequences may ensue."

407 U.S. at 94–95, 92 S.Ct. 1983 (citations omitted) (quoting *D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 186–88, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)). The Court's words need no complex exegesis, and no reader could fail to recognize Monsanto's Technology Agreement in the Court's description of Mrs. Fuentes's onerous contract. True, the *Fuentes* Court found no need to determine whether due process

---

1. The *High Life* court found no unfairness in the forum selection clause under consideration because the clause was part of a negotiated agreement, and because the clause was reciprocal, providing for litigation in the defendant's home forum instead of any one particular venue. *High Life Sales*, 823 S.W.2d at 497.

rights could be voluntarily and intelligently waived by an adhesion contract, because the contractual language in question was not specific enough to waive the rights at issue. *Id.* at 95–96, 92 S.Ct. 1983. Monsanto's Technology Agreement states clearly that the licensee consents to jurisdiction in the Eastern District of Missouri. Nonetheless, the Court's analysis in *Fuentes,* in every respect pertinent to the facts of this case, should make clear that McFarling's alleged waiver of the defense of personal jurisdiction falls far short of that required for a contractual waiver of due process rights. I cannot accept that McFarling's signature on the face of the Technology Agreement was a voluntary, intelligent, and knowing acceptance of the constitutional surrender lurking on its back.[2]

The majority bases its conclusion on well-established contract principles maintaining that failure to read a contract will not excuse one from the contract's obligations. I agree, but "these principles have been modified when contract terms appear on the back of a contract." *Advance Elevator Co., Inc. v. Four State Supply Co.,* 572 N.W.2d 186, 188 (Iowa Ct.App.1997). Where the front of a contract makes no reference to terms on its reverse, and the drafter of the contract does not bring the language on the reverse side of the contract to the attention of the other party, terms on the reverse are without legal effect. *Id.* at 189.

It is instructive to compare the Technology Agreement to the cruise ship ticket of

*Carnival Cruise Lines v. Shute,* in which the Supreme Court found enforceable a defensive forum selection clause printed on the back of the ticket. The face of Mrs. Shute's ticket prominently advertised the existence of additional terms in no less than three separate places:

> SUBJECT TO CONDITIONS OF CONTRACT ON LAST PAGES

and:

> **IMPORTANT!** PLEASE READ CONTRACT ON LAST PAGES 1, 2, 3

and:

> The provisions on the reverse hereof are incorporated as though fully rewritten.

*Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 605, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).

In contrast, the face of Monsanto's 1998 Technology Agreement has no reference at all to its reverse, and the signature block merely states that the customer has read, understood, and accedes to "the terms and conditions of this Agreement," without any indication at all that some terms might be found on the Agreement's other side. Furthermore, Mrs. Shute conceded that she had notice of the forum selection clause, *see Carnival Cruise Lines,* 499 U.S. at 590, 111 S.Ct. 1522, and thereby satisfied *Fuentes's* criterion that a surrender of due process rights should be made knowingly. McFarling, on the other hand, specifically testified that he was unaware of the existence of the forum selection clause when he signed the Technology

---

**2.** Indeed, even an attorney reading the Technology Agreement might not understand that it purports to subject one to liability for patent infringement in Missouri, for the contract's forum selection clause by its terms applies only "for all disputes arising under this agreement." Case law of this court supports the

proposition that a patent infringement suit "arises under" a license agreement, *see Texas Instruments, Inc. v. Tessera, Inc.,* 231 F.3d 1325, 1331 (Fed.Cir.2000), but we may presume that few feed stores stock the *Federal Reporter* on their shelves.

Agreement. Under penalty of perjury, McFarling swore as follows: "I did not know what was contained on the reverse side of the form was an agreement submitting myself to jurisdiction in Missouri. At the time I purchased the soybean seeds I had no idea that Missouri had any involvement in this matter whatsoever." Other courts confronted with similar circumstances have not hesitated to find that the forum selection clause was not reasonably communicated to the signer and was thereby rendered void. *See, e.g., O'Brien v. Okemo Mountain, Inc.*, 17 F.Supp.2d 98, 103 (D.Conn.1998) (refusing to enforce forum selection clause on reverse of ski lift ticket).

Monsanto's argument for the enforceability of its forum selection clause relies heavily on the Supreme Court's opinion in *Carnival Cruise Lines*. But *Carnival Cruise Lines* provides neither precedent nor rationale for the substantial expansion of the law imposed by the court in this case at Monsanto's request. First and perhaps foremost, *Carnival Cruise Lines*, like *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), approved of a defensive forum selection clause enforced against a plaintiff and did not address the surrender of constitutional rights. Although the Due Process Clause does protect a plaintiff's property interest in his or her claim, *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–31, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 94 L.Ed. 865 (1950), a plaintiff forfeits no interest in life, liberty, or property to the state by agreeing that a future claim may be brought only in a forum of the defendant's choice. In contrast, the interests protected by the Due Process Clause are at their zenith when the machinery of the legal system is invoked against a defendant who has no traffic with the forum in question:

> An out-of-state defendant summoned by a plaintiff is faced with the full powers of the forum State to render judgment *against* it. The defendant must generally hire counsel and travel to the forum to defend itself from the plaintiff's claim, or suffer a default judgment. The defendant may be forced to participate in extended and often costly discovery, and will be forced to respond in damages or to comply with some other form of remedy imposed by the court should it lose the suit. The defendant may also face liability for court costs and attorney's fees. These burdens are substantial, and the minimum contacts requirement of the Due Process Clause prevents the forum State from unfairly imposing them upon the defendant.

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).[3] To be sure, litigation is frequently costly and inconvenient for plaintiffs as well. But a plaintiff takes on its burdens only by choice. A plaintiff like Monsanto may be faced with the unpleasant alternatives of prosecuting suspected infringers like McFarling or forfeiting its valuable proprietary position, but heretofore the burden of initiating infringement litigation where the infringer resides has been accepted as another cost attendant to enjoyment of the patent right. McFarling here has admitted the acts that would constitute

**3.** *Phillips Petroleum* compared the burdens placed by a State upon an absent class-action plaintiff and upon an absent defendant.

infringement; in cases where the factual predicate for infringement is not so clear, it may seem less wise to grant patentees the unrestricted power to drag accused infringers off to distant courts.

Nor did *Carnival Cruise Lines* approve of enforcing a forum selection clause found in a contract of adhesion. Although *Carnival Cruise Lines* referred to the disparity of bargaining power between the cruise line and the passenger, and recognized that under such circumstances the forum selection clause was not subject to negotiation, the Court did not describe the contract for passage on a cruise line as a contract of adhesion. Indeed, by some definitions, a contract for passage on a cruise line could never be a contract of adhesion, because passage on a cruise line is a discretionary purchase and is available from many competing sellers. Some courts would exclude contracts for such goods and services from the definition of adhesion contract altogether. *See, e.g., Jones v. Dressel*, 623 P.2d 370, 374 (Colo. 1981). Thus, the Court in *Carnival Cruise Lines* had no occasion to pass upon the validity of a forum selection clause—even a defensive one—imposed by a contract of adhesion.

Monsanto in this case, and patentees in general, can lay claim to few or none of the policy rationales advanced by the Supreme Court to justify enforcement of the forum selection clause in *Carnival Cruise Lines*. There, the Supreme Court identified three such concerns. First, cruise lines, which by definition carry passengers resident in various fora between several ports, and possibly through international waters, have a special interest in limiting the fora in which they are subject to suit. *Carnival Cruise Lines*, 499 U.S. at 593, 111 S.Ct. 1522. But cruise lines rarely sue

their passengers. While Carnival Cruise Lines had a strong interest in not being carried off to the myriad home fora of its passengers as the defendant in tort suits, Monsanto may pick and choose where and when it brings a patent infringement suit. Moreover, unlike contract or tort, there is one patent law in the land, and a patentee's substantive rights and burdens depend not at all on where its infringement suit is brought. *Cf. The Bremen*, 407 U.S. at 13 n. 15, 92 S.Ct. 1907 (explaining that forum selection clauses may be reasonable because they can provide certainty in the choice of substantive law).

The Supreme Court's second rationale in *Carnival Cruise Lines* was that forum selection clauses have the salutary effect of dispelling confusion about where suits must be brought. 499 U.S. at 593–94, 111 S.Ct. 1522. Defensive forum selection clauses usually achieve this certainty by limiting suit to the defendant's home forum, thereby avoiding a minimum contacts analysis. But offensive forum selection clauses provide little additional certainty because they interfere with basic notions that infringers are sued in fora in which they reside or to which they have directed infringing conduct. Absent the forum selection clause, there would be no question at all that this suit ought to be brought in Mississippi, where the defendant may be found and the allegedly infringing acts transpired. And unlike cruise ship passengers, patent infringers—particularly farmers—tend to stay put, and determining the situs of patent infringement is generally a simple matter.

*Carnival Cruise Lines's* final rationale for enforcing forum selection clauses in form contracts, and the one relied upon most heavily by Monsanto, is that purchasers benefit from such clauses in the form

of lower prices, because a seller will pass on to purchasers the savings it realizes by limiting the fora in which it may be sued. *Id.* at 594, 111 S.Ct. 1522. However much weight this argument based on elementary economics may carry in other contexts, it carries little or none in patent infringement suits. Elementary economics also teaches that a patentee, like any monopolist, sets prices based on consumer demand and not on the cost of production. There is, of course, nothing objectionable about a patentee pricing his product so, but a rational patentee will not pass on cost savings to consumers unless he is receiving no rent, *i.e.,* unless the patent is worthless. Minimizing litigation costs may raise Monsanto's profits, but it is unlikely to benefit farmers.

In sum, the Supreme Court in *Carnival Cruise Lines* did not establish a *per se* rule that forum selection clauses are enforceable. Although the Court reaffirmed *The Bremen's* presumption in favor of enforcement, it also maintained *The Bremen's* requirement that enforcement of the clause be reasonable, and emphasized that "forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness." *Carnival Cruise Lines,* 499 U.S. at 595, 111 S.Ct. 1522. But here, the district court seems to have abstained from any scrutiny of the forum selection clause at all, concluding that the clause was valid and enforceable simply because McFarling signed it. This is not the sort of inquiry contemplated by *Carnival Cruise Lines.* The circumstances of this case, in nearly every instance opposite from those that led the Supreme Court to find enforcement of the forum selection clause fair and reasonable in *Carnival Cruise Lines,* ought to compel a more meaningful inquiry if the guarantees of the Fifth Amendment are to be given their proper due.

I can find no reported case in the thirty years since *Fuentes* and *The Bremen* were decided in which a court has enforced a forum selection clause against a defendant who has acceded to an adhesion contract.[4] Certainly there is no shortage of cases in which a defensive forum selection clause controls, most notably *Carnival Cruise Lines.* Far fewer are cases in the ordinary commercial context in which a plaintiff brings suit on the basis of a forum selection clause signed by the defendant, and at best courts are divided on how to approach such cases. *Compare Mellon First United Leasing v. Hansen,* 301 Ill. App.3d 1041, 235 Ill.Dec. 508, 705 N.E.2d 121 (1998) (refusing to exercise jurisdiction over out-of-state defendant based on forum selection clause in mailing equipment lease) *with Chase Third Century Leasing Co. v. Williams,* 782 S.W.2d 408 (Mo.Ct. App.1989) (exercising jurisdiction over out-of-state defendant based on forum selec-

---

4. My colleagues in the majority bicker over whether any court has enforced against a defendant a forum selection clause in a contract of adhesion. I stand by my research. *Carnival Cruise Lines* did not involve a contract of adhesion, and neither did *Northwestern National Insurance Co. v. Donovan,* 916 F.2d 372 (7th Cir.1990). In *Donovan,* the court characterized some contracts, but not the contract in suit, as "adhesion" contracts. None of the indicia of an adhesive contract (disparity of bargaining power, practical ne-

cessity for the defendant to yield to the form contract demand of the plaintiff, unusual market power of the party imposing the form contract, etc.) was present in *Donovan.*

My colleagues have the honor of making this court the first to enforce a forum selection clause in a contract of adhesion against a defendant in derogation of his constitutional rights.

tion clause in copier lease).[5]  But no court has gone so far as to hold that a true contract of adhesion can subject a defendant to litigation in a court that would otherwise have no power over him.  If any court goes so far, it should be the Supreme Court, not this court.

---

**5.**  Any lessee, of course, signs a lease knowing with near-absolute certainty that the lessor will ultimately commence legal action should the lessee default on the lease payments.  To sign a lease is to invite a lawsuit.  Likewise, a franchisee signs a franchise agreement knowing that he or she assumes particular obligations to the franchisor.  The same may not be true for a farmer purchasing a bag of soybean seed.  Nor, like a cruise ship passenger, does a farmer buying seed intentionally expose himself to the law of another jurisdiction.  Cf. *Hodes v. S.N.C. Achille Lauro ed Altri–Gestione,* 858 F.2d 905, 913 (3d Cir. 1988) ("We note that this is not a case in which a consumer contracted to have a service rendered or buy a product in his/her home jurisdiction only to later learn of the existence of a forum selection clause.").